IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| WYNDHAM VACATION RESORTS, INC., formerly known as FAIRFIELD RESORTS, INC., | ) ) ) | CV. NO. 08-00236 DAE-LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ARCHITECTS HAWAII LIMITED; GROUP PACIFIC (HAWAII), INC.; DICK PACIFIC CONSTRUCTION CO., LTD, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| ARCHITECTS HAWAII LIMITED, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NOTKIN HAWAII, INC.; DICK PACIFIC CONSTRUCTION CO., LTD; JOHN DOES 1-10; JANE DOES 1-20; DOE PARTNERSHIPS 1-20; DOE CORPORATIONS 1-20; DOE ENTITIES 1-20; and DOE GOVERNMENTAL UNITS 1-20, | ) ) ) ) ) ) ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| _____ | ) | |

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AGAINST ARCHITECTS HAWAII LIMITED

On March 8, 2010, the Court heard Plaintiff's Motion for Summary
Judgment against Defendant Architects Hawaii Limited.  Judy A. Tanaka, Esq.,
appeared at the hearing on behalf of Plaintiff; Michael L. Biehl, Esq., and Natalie
F. Wilson, Esq., appeared at the hearing on behalf of Architects Hawaii Limited;
Frank K. Goto, Jr., Esq., and Jane Kwan, Esq., appeared at the hearing on behalf of
Notkin Hawaii, Inc.  After reviewing the motion and the supporting and opposing
memoranda, the Court **GRANTS** Plaintiff's Motion.  (Doc. # 180.)

BACKGROUND

This matter arises from a breach of contract dispute involving a hotel
renovation project.  Plaintiff Wyndham Vacation Resorts, Inc., formerly known as
Fairfield Resorts, Inc. ("Wyndham"), Defendant and Third-Party Plaintiffs
Architects Hawaii Limited ("AHL"), and Third-Party Defendant Notkin Hawaii,
Inc. ("Notkin") generally agree on the basic events leading up to this litigation.

Wyndham is the owner of the construction project known as Fairfield
Hawaii at Waikiki Resort (the "Project"), which consists of a timeshare conversion
of the Outrigger Hotels' Ohana Reef Hotel located on Lewers Street in Waikiki,
Hawaii.  The Project includes converting approximately 420 hotel rooms in two

2

towers, as well as renovations of related public spaces, amenity spaces, and support facilities.  (Doc. # 152 at 4.)

Wyndham retained AHL as architectural and design consultant, and contracted with AHL to perform architectural and building engineering design services for the Project.  Notkin, a subconsultant of AHL, was retained by AHL as the mechanical engineer for the Project.  Defendant and Third-Party Defendant Group Pacific (Hawaii), Inc. ("GPH"), acted as Wyndham's project manager in 2004 and 2005. (Doc. # 180 at 6.)  Defendant and Third-Party Defendant Dick Pacific Construction Co., Ltd. ("DPC") was the general contractor for the Project.[1]

On or about December 20, 2002, Wyndham, as the owner, and AHL, as the consultant, entered into an "Agreement Between Owner and Consultant" ("Agreement").  Section 2.3.1 of the Agreement required AHL to:

> [C]oordinate the services and work product of Subconsultants, and remain fully responsible for the professional quality, technical accuracy and coordination of all designs, drawing, specifications, and other services furnished by Consultant or its Subconsultants, and Consultant shall review and approve any designs, specification, shop drawings, submittals, or other services produced or furnished by a Subconsultant prior to submittal to the Owner.  Consultant shall correct or revise any of its errors or deficiencies in the designs,

---

[1] As of February 19, 2010, all claims against DPC have been dismissed. (Doc. # 220.)

> drawings, specifications or other services provided
> pursuant to this Agreement and shall provide Owner with
> such corrected or revised designs, drawings, or
> specifications incorporating such corrections or revisions
> at its sole cost and expense.

(Doc. # 183 Ex. A at 3-4 (emphasis added).)

The type of bathtubs to be installed in the rooms was described in the "Resort Development Standard Manual" ("Project Manual"), which was provided to AHL before preparing Project plans, drawings, and specifications.  (Doc. # 180 at 7; Doc. # 197 at 1.)  Section 5.9.1 of the Project Manual provides that "[a] Master Bathroom with luxury bathing accommodations is required in all guest units," and Section 5.9.2 requires that "whirlpool" jetted bathtubs be installed in all master bathrooms.  (Doc. # 183 Ex. B at 1.)  Wyndham claims that AHL breached its contract by installing, or allowing subconsultants to install, non-jetted bathtubs instead of whirlpool jetted bathtubs at the Project site.

An email correspondence dated September 24, 2004, was sent by Joe Davis, then Vice President of Project Development for Wyndham Vacation Ownership, to Mark Tuner of GPH, specifically commenting, "The whirlpool tub in the master bath is a Fairfield 'sacred cow.'  Substitution of a standard tub is NOT acceptable."  (Doc. #183 Ex. C at 2.)  The email was subsequently forwarded to Alain Geronimo of AHL, among others.  (Id. at 1.)

On or about December 31, 2004, AHL prepared and/or approved architectural and mechanical drawings requiring:  (1) <u>non</u>-jetted bathtubs (hereinafter "TUB 1") to be installed in One-Bedroom Units of the Plantation Wing; and (2) <u>jetted</u> bathtubs (hereinafter "TUB 2") to be installed in master bathrooms of Two-Bedroom and Presidential Units.  (Doc. # 180 at 9.)  Contrary to these Project specifications, AHL approved specifications ("Plumbing Fixture Schedule Mechanical Sheet M-004") prepared by subconsultant Notkin that also called for <u>non</u>-jetted tubs in TUB 2 locations (i.e., Two-Bedroom and Presidential Units).  Wyndham asserts that neither of the specifications should have called for non-jetted tubs.  (<u>Id.</u> at 8-10).  The end result is that both TUB 1 and TUB 2 were non-jetted bathtubs, despite the original directive from Wyndham that all tubs were to be jetted bathtubs.

Wyndham asserts, but Defendants AHL and Notkin deny, that Wyndham first discovered that non-jetted bathtubs were being installed during a progress walkthrough on or about January 10, 2006.  (<u>Id.</u> at 11; Doc. #197 at 2; Doc. # 190 at 5.)  On January 17, 2006, an Instruction Notice was sent by AHL to DPC, the general contractor, directing it to promptly stop installing the non-jetted tubs and replace them with whirlpool jetted tubs.  (Doc. # 180 at 11.)

As a result, 136 non-jetted bathtubs were replaced with jetted ones at a total cost of $591,135.00.  (Doc. # 152 at 7; Doc. # 180 at 11.)  Wyndham paid that amount to DPC and sought reimbursement from AHL.  (Doc. # 180 at 11.)  AHL has not reimbursed Wyndham, thus leading to Wyndham's present action against AHL for breach of contract.

On May 21, 2008, Wyndham filed its original Complaint in this Court against AHL, asserting jurisdiction based on diversity of citizenship.  (Doc. # 1.)  On June 15, 2009, Wyndham filed a First Amended Complaint ("First Amended Complaint" or "FAC").  (Doc. # 152.)  The FAC was brought against AHL, GPH, and DPC.  Count I is a breach of contract claim against AHL.  Counts II and III are claims against GPH for breach of contract and negligence, respectively.  Counts IV and V are breach of contract and negligence claims against DPC.  Because DPC was dismissed from this action via stipulation between all parties, only Counts I, II, and III remain to be litigated.  Wynhdam seeks damages in an amount to be proven at trial.

The defendants and third party plaintiffs have filed various Cross Claims and Counter Claims not immediately relevant to the instant motion before this Court.  On February 19, 2010, all parties stipulated to dismiss with prejudice all claims against DPC.  (Doc. # 220.)  On the same day, the parties also stipulated

to dismiss without prejudice Notkin's Cross Claim against GPH and GPH's Cross Claim against Notkin.  (Doc. # 221.)

On December 16, 2009, Wyndham filed the instant Motion for Summary Judgment against AHL, Count I of the FAC.  (Doc. # 180.)  On January 26, 2010, AHL filed an Opposition.  (Doc. # 196.)  Notkin filed its Opposition on the same day.  (Doc. # 190.)  On February 2, 2010, Wyndham filed its Replies to both Oppositions.  (Docs. ## 204, 205.)

## STANDARD OF REVIEW

Rule 56 requires summary judgment to be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  A main purpose of summary judgment is to dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  A moving party without the ultimate burden of persuasion at trial -- usually,

but not always, the defendant -- has both the initial burden of production and the

ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire &

Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden

initially falls upon the moving party to identify for the court those "portions of the

materials on file that it believes demonstrate the absence of any genuine issue of

material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d

626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

       Once the moving party has carried its burden under Rule 56, the

nonmoving party "must set forth specific facts showing that there is a genuine

issue for trial" and may not rely on the mere allegations in the pleadings.  Porter,

419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986)).  In setting forth "specific facts," the nonmoving party may not meet its

burden on a summary judgment motion by making general references to evidence

without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885,

889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary

judgment, the court shall have no independent duty to search and consider any part

of the court record not otherwise referenced in the separate concise statements of

the parties.").  "[A]t least some 'significant probative evidence'" must be

produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v.

Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."  Addisu, 198 F.3d at 1134.  Further, "[c]onclusory allegations unsupported by factual data cannot defeat summary judgment."  Rivera v. Nat'l R.R. Passenger Corp., 331 F.3d 1074, 1078 (9th Cir. 2003).

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."  T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party.  Porter, 419 F.3d at 891.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage.  Id.; see also Nelson v. City of Davis, 571 F.3d 924 (9th Cir. 2009) ("[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (citations omitted).  However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.  T.W. Elec. Serv., 809 F.2d at 631.

## DISCUSSION

Wyndham moves for summary judgment on the theory that there is no material issue of fact as to the actions taken by all parties and that Wyndham is entitled to judgment against AHL for breaching its obligation to ensure jetted tubs were installed in all master bathrooms.  In particular, Wyndham alleges that AHL acted in direct contravention to directions from Wyndham and the Project Manual when AHL:  (1) specified certain non-jetted bathtubs in AHL's own Project Specifications; and (2) either approved or failed to correct errors in Notkin's mechanical sheets that specified non-jetted bathtubs in the remaining bathrooms. (Mot. at 4, 6-10.)

It is undisputed that section 5.9 of the Project Manual specified that a "Master Bathroom with luxury bathing accommodations is required in all guest units," and that a "whirlpool tub" was required to be installed in each master bathroom.[2]  (Id. at 7; Mot. Ex. B at 1.)  Nevertheless, as recounted above, AHL's Project Specifications called for whirlpool jetted tubs only in the master bathrooms of Two-Bedroom and Presidential Units (TUB 2) and called for non-jetted tubs in

_____

[2] AHL disputes the fact that Wyndham quotes the 2001 Project Manual in its motion, and argues that the 2004 Project Manual is applicable instead.  This issue does not appear to be material, because the parties agree that the two manuals include the same or substantively similar requirements, as discussed elsewhere in this Order.

10

One-Bedroom Units of the Plantation Wing (TUB 1).  Subsequently the

Mechanical Sheet provided by Notkin eliminated all jetted tubs.  (Mot. 9-10; Mot

Ex. D, E, F.)  Essentially, Wyndham contends that it clearly required all master

bath bathtubs to be whirlpool jetted tubs, but a cascade of errors by AHL resulted

in installation of non-jetted tubs.

It is likewise undisputed that Wyndham paid $591,135.00 to DPC to

replace the tubs.  (David Mot. Decl. Ex. G, J.)

In opposition, Notkin and AHL both argue that various issues of

material facts exist as to whether Wyndham in fact approved or ratified the tub

substitutions, thereby precluding summary judgment.  The Court will evaluate each

alleged issue of material fact in turn.

I.      Value Engineering and Deviations from the Project Manual

To bolster its argument that Wyndham deviated from the Project

Manual and approved the non-jetted tubs, AHL recounts a history of purported

deviations from the Project standards and describes steps taken to cut costs.  The

process the parties undertook to cut costs is referred to as "value engineering."

AHL essentially argues that prior deviations and cost cutting steps "blurred" the

standards such that AHL's decision to replace jetted with non-jetted tubs is not

breach of contract.  (AHL Opp'n at 4-8.)

11

First, AHL generally summarizes that the "physical dimensions of the existing building presented challenges to creating units that complied with Fairfield's standards." (Id. at 4.)  AHL states that Fairfield's[3] representatives participated in designing and re-designing around various physical obstacles, and even recognized that the standards would be "stretched" to fit the dimensions. (Id. at 4-5.)  For example, certain room sizes necessitated a change in furniture and fixtures. (Id. at 5.)  AHL believes that the Plantation Wing bathrooms were such an example, and that the space would not accommodate the intended 5'6" jetted tub. (Id.)

The Project underwent a value engineering, in which the parties attempted to cut millions of dollars out of the construction budget. (Id. at 6.)  In an email dated September 24, 2004 Joe Davis of Wyndham Vacation Ownership informed Mark Turner of GPH that "one of [his] comments on the drawing review was to specify FRI standard products, unless Kohler is less expensive in Hawaii. Nevertheless, the [TUB 2] is the whirlpool tub in the master baths where the corner tub would not fit.  The whirlpool tub in the master bath is a Fairfield 'sacred cow.'

---

[3] Fairfield is a prior owner of the Project.  Ownership of the Project has apparently been transferred several times, most recently to Wyndham. (AHL Opp'n at 1 n.1.)  The Court will refer to the Owner as Wyndham throughout this Order.

12

Substitution of a standard tub is NOT acceptable" (hereinafter "the sacred cow email").  (Mot. Ex. C. at 2 (emphasis added).)

There is no dispute that these events and communications occurred. Instead, the parties dispute the weight and importance to place on what transpired.

The Court will review the arguments in light of the various project documents on record.  The Project Manual contains an express statement on modification of standards.  Section 1.4 of the Project Manual, titled "Requests for Changes to Resort Development Standards Manual," reads in its entirety:

> Fairfield Resorts may change the Resort Development Standards Manual on a periodic basis.  In addition, the input of staff, management, consultants, and other end users make the Manual as complete and up to date as possible.  Such proposed changes are submitted by a Property Manager to the appropriate Regional PM using the Request for Change Form in the Appendix.  Changes require signed approval of the Regional Property Manager, Standards Committee Chair, VP of Property Management, and Fairfields Resorts VP of Construction and VP of Real Estate Planning.

(Mot. Ex. K at 1-4 (emphasis added).)  The language of section 1.4 clearly anticipates that modifications to the standards may occur, and sets out the procedures through which the modifications may be reviewed and approved.  The procedure dictates that a Request for Change Form must be submitted and various managers and chairs must sign to indicate their approval.

13

The Project Manual is referenced, although not explicitly so, in the Wyndham-AHL Agreement via the Agreement's repeated reference to "Contract Documents."  The parties all appear to be in agreement that AHL was obligated to follow the standards set out in the Project Manual.

Terms within the Agreement itself also indicate that changes to the Agreement must be made in writing and be signed.  For example, section 3.1.2 of the Agreement requires AHL to notify Wyndham, in writing, whenever additional services may be required due to circumstances beyond AHL's control.  (Davis Mot. Decl. Ex. A at 4.)  AHL was required to "receive written authorization from [Wyndham] prior to commencing such services."  (Id.)

The terms of both the Agreement and the Project Manual preclude any possibility of implied modification of contract or specifications.  The Agreement includes terms requiring signed, written approval prior to modifying services rendered.  The Project Manual specifically states that any modification of the standards must be approved in writing with signature.  Any reliance on an alleged implied modification of the contract or change order is unavailing.

Alternatively, even if implied modification were permissible under the terms of the Agreement between AHL and Wyndham, AHL and Notkin have failed to demonstrate assent by Wyndham for the tub specification modification.  Without

being able to show that Wyndham was aware that a tub substitution was being

proposed, AHL cannot show that the project specifications had been modified to

permit AHL to substitute non-jetted tubs for jetted tubs.

AHL attempts to demonstrate assent by a failure to act.  AHL

contends that personnel had general knowledge that various changes would have to

be made to the specifications in order to fit the existing building structure, and that

because no one objected to a possible change in the tub specifications, the changes

were accepted.  For instance, AHL argues that it was always understood that the

non-jetted TUB 1 tubs, which AHL itself included in its own Project

Specifications, would be used due to the problems with the existing building

structure.  (AHL Opp'n at 10.)  According to AHL, Joe Davis was "well aware that

certain of the one-bedroom units could not accommodate Fairfield's standard

appointments because of the existing structure."  (Id.)

Furthermore, ALH argues that the Plantation Wing Unit, in which

TUB 1 units were to be installed according to AHL's December 31, 2004 plan, "is

a clear example of the deviations necessitated by the existing structure," that the

"bathtub was wedged between an existing concrete staircase and corridor," and that

the "space would not accommodate a 5'6" tub" meeting the standards.  (AHL

Opp'n at 5-6.)  The Court notes the obvious contradiction to ALH's argument is

15

the fact that jetted tubs have, in fact, subsequently been installed.  Installation of the jetted tubs and reimbursement for that cost is the impetus for this lawsuit.

Pertinent to ALH's own argument, ALH itself acknowledges that a 5'0" jetted tub could have been used as an alternative.  (ALH Opp'n at 6 n.2.) ALH does not provide any evidence that a smaller, jetted tub was rejected by Wynhdam.  To the contrary, the "sacred cow" email acknowledged that tub sizing might be modified, all the while maintaining that the tubs must be whirlpool jetted tubs:  "Nevertheless, the [TUB 2] is the whirlpool tub in the master baths where the corner tub would not fit.  The whirlpool tub in the master bath is a Fairfield 'sacred cow.'  Substitution of a standard tub is NOT acceptable."  (Mot. Ex. C. at 2.) Moreover, the question of the <u>length</u> of the tub is inapposite to the question of whether there are <u>whirlpool jets</u> in the tub.

Nowhere does AHL state that any person actually approved the tub replacement.  AHL points only to the lack of objection.  (AHL Opp'n at 6 n.2.) The lack of objection, itself, does not demonstrate approval, because there are no facts in the record indicating that Wyndham ever knew that the jetted tubs would be replaced with non-jetted tubs.  Without Wyndham's knowledge of the change, Wyndham could not have been in agreement with AHL.

16

There is no evidence in the record before this Court of any oral modification of the contract or specifications of the tub. Nor did Wyndham engage in conduct that would contradict the clear directive that jetted tubs alone were acceptable, as stated in Davis' September 24, 2004 "sacred cow" email to Mark Turner. Under the circumstances presented here, the Court cannot reasonably conclude that Wyndham manifested an intention to agree to a substitution of the non-jetted tubs. Indeed, there is no actual evidence before the Court that Wyndham was even aware that non-jetted tubs were being installed, other than mere conjecture.

Accordingly, AHL and Notkin have failed to raise a genuine issue of material fact, and this Court finds that there was no implied modification of the contract or project specifications.

## II.   Approval or Ratification of Non-Jetted Tubs

AHL and Notkin next argue in the alternative that Wyndham had either approved non-jetted tubs or ratified the use of non-jetted tubs once they were installed.

### A.   Approval of Non-Jetted Tubs

First, AHL and Notkin posit that a pricing estimate including non-jetted tubs equates to approving installation of non-jetted tubs. On December 13,

17

2004, DPC sent a cost estimate to GPH.  Within that cost estimate, DPC quoted

prices for Kohler K1219 tubs, which are non-jetted tubs.  (AHL Opp'n at 6-7;

Miller Opp'n Decl. ¶ 15.)  The explanation for this price substitution was that DPC

had been unable to price the jetted tubs due to an absence of local representatives

to provide quotes.  (AHL Opp'n at 6.)  Significantly, however, AHL admits that

the price quote did <u>not</u> indicate that the Kohler tubs were, in fact, non-jetted tubs.[4]

(<u>Id.</u> at 7 n. 4.)  It appears undisputed that the remaining TUB 2 tubs were installed

as non-jetted tubs after DPC provided its December 13, 2004 cost estimate.  (<u>Id.</u> at

10.)

  According to AHL, because GPH received DPC's cost estimate and

then passed that estimate on to AHL without objecting specifically to DPC's cost

analysis, GPH tacitly approved the non-jetted tub style.  Notkin argues that the

changes that DPC submitted, and the incorporation of these price quotes, create a

genuine issue of material fact.  (Notkin Opp'n at 6.)

  The argument that incorporating DPC's pricing estimate equates to

approval is tenuous.  The Court understands the facts to be as follows.  DPC was

---

  [4] During the hearing on this matter, counsel for AHL argued for the first time
that all parties were aware that the Kohler K1219 tubs were non-jetted tubs.
Argument of counsel is not evidence, however, and there is nothing before the
Court that indicates that Plaintiff was actually aware that the Kohler tubs lacked
jets.

required to submit a pricing estimate.  Because DPC was unable to contact a local representative for the specific tubs Wyndham wanted installed, DPC used an estimate from the Kohler K1219 model tub instead.  The final version of the pricing estimate <u>did not state</u> that the tubs used in the estimate lacked jets.  Once DPC submitted that estimate to GPH, GPH passed the estimate on to AHL.  There was no further discussion between GPH or DPC on the matter.

AHL's argument fails for at least two reasons.  First, there is no evidence that GPH had the authority to approve tub substitution.  AHL's contention that they thought GPH had "apparent authority" to do so is dubious, as the Project Manual clearly lays out the chain of steps that modifications must go through to be approved and there is no evidence now in the record that GPH had approved other such changes in the past.  Second, even if AHL had reason to think GPH might have authority to modify the specifications, there is absolutely no reason for this Court to conclude that GPH was even aware of the substitution when GPH passed the estimate on to AHL.  This Court cannot conclude that there was a meeting of the minds to accept the non-jetted substitute tubs.

Notkin presents a second theory for how Wyndham may have approved of the substitution.  According to Notkin, Wyndham personnel had discovered the error after an October-November 2005 site inspection of model

rooms completed by DPC.  (Notkin Opp'n at 5.)  According to Notkin, the

walkthrough of the model rooms, which included non-jetted tubs, amounts to either

approval or acquiescence of the use of non-jetted tubs.  Wyndham disputes this

time line, and asserts that it did not discover the error until a progress walkthrough

on January 10, 2006, a few days before the stop-work order was given.  (Mot. at

11.)

   Notkin asks this Court to make the inference that Wyndham approved

the use of the non-jetted bathtubs simply by walking through a model room and not

objecting to the non-jetted tubs.  Notkin relies on the affidavit of Lane Uchimura,[5]

Senior Vice President of DPC, which states that "[i]n approximately October to

November 2005, DPC completed work on model rooms which were then inspected

and reviewed by Fairfield [Wyndham's predecessor] and AHL for quality,

construction and design compliance.  The rooms included the non-jetted tub

specified in Change Order No. 2."  (Uchimura Notkin Opp'n Aff. ¶ 20.)

   It is notable that Notkin presents no evidence, in testimony or

otherwise, that Wyndham personnel actually discovered the error during the

---

[5] Plaintiff's counsel argued at the hearing that Lane Uchimura does not have personal information of the walkthrough and that the testimony is not admissible. This information, even if considered by the Court, does not create a genuine issue of material fact.

walkthrough.  Notkin's allegations are pure speculation.  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."  Addisu, 198 F.3d at 1134.  There is no evidence before this Court that Wyndham personnel observed the absence of jets, and no evidence that Wyndham personnel behaved in such a way as to suggest acceptance of the substitution.  Without any probative evidence that Wyndham's personnel actually discovered the mistake, Notkin fails to demonstrate a genuine issue of material fact.

Furthermore, under the terms of the Agreement with AHL, it was AHL's duty to monitor and correct the activities of the subconsultants, not Wyndham's responsibility.  Pursuant to Section 2.3.1 of the Agreement, AHL is obligated to "remain fully responsible for the professional quality, technical accuracy and coordination of all designs, drawing, specifications, and other services furnished by Consultant or its Subconsultants."  This Court can locate no term in the Agreement stating that a walkthrough by Wyndham absolves AHL of its obligation to comply with project specifications.

B.     Ratification

AHL further argues that, even if there was no approval of the substitution, Wyndham ultimately ratified the substitution.  (AHL Opp'n at 13.)

21

As its sole evidence that Wyndham ratified GPH's alleged acceptance of the tub substitution, AHL points to a separate contract between Wyndham and DPC that had incorporated the December 13, 2004 estimates, which in turn had included the price of non-jetted tubs.  (AHL Opp'n at 13.)

AHL's argument for ratification does not rest on an appropriate application of the doctrine.  "Ratification may generally be defined as the adoption or confirmation of a prior act professedly performed on the principal's behalf by an agent without the agent obtaining prior authority."  12 Williston on Contracts § 35:22 (4th ed. 1989).  Furthermore, "[w]here an agent lacks actual authority to agree on behalf of the principal, the principal may still be bound if the principal acquiesces in the agent's action, or fails to promptly disavow the unauthorized conduct after acquiring knowledge of the material facts."  Id.

Similarly, Hawai`i courts recognize that ratification rests on principles of agency law and define the term as "'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'"  Ass'n of Apartment Owners of Maalaea Kai, Inc. v. Stillson, 108 Hawai`i  2, 29 (2005) (citing Maui Fin. Co., Ltd. v. Han, 34 Hawai`i  226, 230 (Terr. 1937)).  Furthermore, "[s]uch affirmance can be established by any conduct

manifesting to treat an unauthorized act as authorized or conduct justifiable only if there were such an election." Id.

Ratification requires: (1) the existence of a principal; (2) an act done by a purported agent; (3) knowledge of the material facts by the principal; and (4) an intent by the principal to ratify the act. Id. (citing Robertson v. Jessup, 773 P.2d 385, 387 (Or. Ct. App. 1989)). In effect, "[t]he principal ratifies the prior act if, with full knowledge of the facts, he 'accepts the benefits of the acts' or assumes that an obligation is imposed." Id. (emphasis added) (citing In re Eicholz, 310 B.R. 203, 208 (W.D. Wash. 2004)).

Wyndham's separate contract with DPC does not satisfy the requirements for ratification. Even if this Court were to presume that the first prong is satisfied, i.e., that Wyndham is the principal and GPH is the agent, the remaining criteria are not met. The second prong of the ratification analysis requires that there be a purported "act" by the agent. Although the briefing is unclear, it appears AHL is suggesting that GPH's "act" was the implicit approval of the installation of non-jetted tubs, demonstrated when GPH forwarded the DPC price estimate to AHL. AHL argues that forwarding, and not objecting to, the price estimate was an implicit approval because that cost estimate quoted prices for "Kohler K1219 tubs," which are non-jetted tubs. AHL admits, however, that the

23

price quote did not indicate that the Kohler tubs were, in fact, non-jetted tubs.

Similarly, no evidence has been presented that GPH was aware that the price

estimate included quotes for non-jetted tubs.  As such, merely forwarding a price

estimate does not constitute an "act" of approval by GPH because GPH could not

have approved something that was not even noted in the estimate.

Even if the Court assumes, <u>arguendo</u>, that GPH's forwarding of the

DPC price estimate was an "act" that could potentially bind Wyndham, the third

and fourth prongs of the ratification analysis are clearly not satisfied.  In an

attenuated argument, AHL appears to suggest that Wyndham's implicit approval

(by entering into a contract with DPC) constituted ratification of GPH's implicit

approval of the pricing estimate.  Such an argument does not satisfy the

requirement that in order to be bound by an agent's unauthorized act, the principal

needs <u>full knowledge</u> of the material facts and <u>an intent to approve the agent's act</u>.

As mentioned, no evidence has been presented to show that GPH, let alone

Wyndham, had full knowledge or an intent to approve the installation of non-jetted

tubs.  This Court has already found that Wyndham was unaware that the pricing

included non-jetted tubs.  There is no evidence in the record to refuting

Wyndham's intent to install jetted tubs, evidenced both by the Project Manual and

the "sacred cow" email.

24

Accordingly, the Court concludes that Wyndham did not ratify installation of non-jetted tubs.

III.   <u>Miscellaneous Factual Disputes</u>

AHL raises additional factual disputes, none of which can be considered material to the question at hand.  First, AHL states that the 2004 Project Manual, as opposed to the 2001 Project Manual, applies to the work conducted by AHL.  (AHL Opp'n at 3.)  As Wyndham notes, however, AHL concedes that the applicable standards in the 2001 and 2004 manuals are "generally the same."  (<u>Id.</u> at 3-4)  AHL states that the "general standard of quality and desired effect did not change dramatically."  (<u>Id.</u>)  AHL does not indicate how the 2004 Manual might change this Court's analysis, and indeed it appears it would not.  Therefore, Wyndham's reference to the 2001 Manual in its motion is not a material issue.

AHL then argues that David Miller, Principal of AHL, had promised only that AHL would investigate the error, not that AHL would reimburse Wyndham for the cost.  (<u>Id.</u> at 4.)  Even assuming this statement is true, it does not raise a genuine issue of material fact, as AHL has contractual obligations to reimburse Wyndham regardless of what Mr. Miller might have said in an isolated communication.

Accordingly, despite AHL and Notkin's contentions to the contrary, there does not appear to be any genuine issue of material fact on these matters, and their arguments as to approval or ratification of the tub substitution are meritless. The Court will therefore next consider the matter of AHL's liability.

IV.    Breach of Contract by AHL

To prevail on this breach of contract claim, Wyndham must establish that a contract exists, and that AHL failed to preform as required by the contract. See Stanford Carr Dev. Corp. v. Unity House, Inc., 111 Hawai`i 286, 303-04 (2006).

The parties do not dispute that the Agreement was a valid contract between Wyndham and AHL.  The parties also do not dispute that the Agreement, the Project Manual, and the "sacred cow" email together expressly required whirlpool jetted tubs in the master bathrooms.  Neither defendant has suggested that Wyndham itself has not performed its duties under the contract.  Nor does either defendant dispute that non-jetted, instead of jetted, tubs were installed.

This Court has already rejected AHL and Notkin's attempts to explain the erroneous installation of the jetted tubs.  The Court has concluded that there was no approval and no ratification of the substitution.

Section 2.3.1 of the Wyndham-AHL Agreement explicitly allocated to AHL the responsibility for the quality and accuracy of all specifications, and to correct or revise any errors in specifications at its sole cost and expense. (Davis Mot. Decl. Ex. A.) Thus, defense counsel's contention at the hearing that there is a genuine issue of material fact regarding who made the error is unavailing. Whether AHL or a subconsultant made the error does not absolve AHL of its obligation under the contract to remain fully responsible for the accuracy of the designs and specifications of the subconsultants. Any question about whether AHL or one of the subconsultants made the error does not create a genuine issue of material fact. AHL therefore is liable for breach of contract for preparing or approving non-jetted tubs to be installed in One-Bedroom Units of the Plantation Wing, and for approving specifications prepared by Notkin to install non-jetted tubs in the master bathrooms of Two-Bedroom and Presidential Units.

Accordingly, Wyndham's motion for summary judgment on the issue of AHL's liability is GRANTED.

<u>CONCLUSION</u>

For the reasons stated above, the Court GRANTS Plaintiff's Motion for Summary Judgment as to Count I.  Counts II and III remain.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 10, 2010.



_____
David Alan Ezra
United States District Judge


<u>Wyndham Vacation Resorts, Inc. v. Architects Hawaii Limited, et al.</u>, CV No. 08-00236 DAE-LEK; ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST ARCHITECTS HAWAII LIMITED